DORFMEIER, Gdn., Plaintiff, v. DORFMEIER, Admr. et, Defendants.

Probate Court, Montgomery County.

No. 125539. Decided June 19, 1954.

16

William D. Dorfmeier, Dayton, Guardian of the Estate of Frances Hope Meeks, Incompetent, plaintiff and also defendant.

Virgil Z. Dorfmeier, Dayton, Administrator of the Estate of Carl B. Meeks, Deceased, defendant.

Pickrel, Schaeffer & Ebeling, Dayton, for defendant Citizens Federal Savings and Loan Association of Dayton.

M. K. Margolis, Dayton, Guardian ad Litem for Marion Meeks, Mark Meeks, and Carolyn Meeks, defendants herein, and Trustee for the suit for Frances Hope Meeks, defendant.

Jesse L. Jennings, Dayton, for Marion Meeks.

## OPINION

By LOVE, J.

This cause came on to be heard upon the petition of William D. Dorfmeier, the duly appointed guardian of the estate of Frances Hope Meeks, surviving spouse of Carl B. Meeks, for authority to elect to purchase the mansion house of the decedent at the appraised value on behalf of his ward. The administrator of the estate of Carl B. Meeks, the minor children of the decedent, and all others having an interest in said property are properly before the Court by service of summons or by pleadings duly filed. The answers filed by the guardian ad litem for the minor children of the decedent and by the trustee for the suit of the incompetent generally deny all allegations of the petition.

The evidence discloses that the principal asset of the estate of Carl B. Meeks, deceased, is an undivided one-half (½) interest in the real estate which the surviving spouse through

her guardian seeks to elect to purchase and that the other undivided one-half (½) interest is owned by the surviving spouse. The evidence further discloses that she has considerable credit against her deceased husband's estate by virtue of her statutory exemption and years allowance and that she is also individually liable for the full amount of a mortgage on said property which she executed when she was competent. The evidence does not disclose any additional liability to be incurred on behalf of the incompetent. The evidence further discloses that the tentative arrangements made by the guardian of Frances Hope Meeks following the purchase of the property will provide a home for this incompetent during trial visits from the Dayton State Hospital, will provide a home for the minor children of the incompetent, and will be a source of income for the support of the incompetent and her family. The evidence further discloses that the property sought to be purchased is a frame double house, one side of which was occupied by the decedent and his family during his lifetime. The other side is divided into two apartments, one on the first floor and one on the second floor which have been and still are rental units. The basement extends under both sides of the house and there is no garage on the premises. That side of the house which consists of the rental units provides a return of slightly in excess of five percent (5%) on the capital investment based upon present value.

Before considering the right of an incompetent spouse to purchase a mansion house at the appraised value, it must first be determined whether there is a mansion house to be purchased and the extent thereof. This fact is in issue because of the general denials which have been filed by the guardian ad litem and the trustee for the suit.

The statutory provision granting a surviving spouse the right to take land at the appraised value was enacted effective January 1, 1932. **Sec. 10509-89 GC; 114 v. 320 (420).** At that time the right to take included "the home and its contents." Effective September 2, 1935 the sub-section was changed to substantially its present form as follows:

"(a) The mansion **house,** including the parcel of land on which the same is situated and lots or farm land adjacent thereto and used in conjunction therewith as the **home** of the decedent, and the household goods contained therein, at the appraised value as fixed by the appraisers." (Emphasis supplied.)

The comment by the Probate and Trust Law Committee of the Ohio State Bar Association with reference to this change is as follows:

"We also suggest that the words, 'the home and its contents' which have received almost as many different constructions as there are probate courts, be changed to, 'the mansion house, including the parcel of land on which the same is situated and lots or farm land adjacent thereto and used in conjunction therewith as the home of the decedent, and the household goods contained therein,' in the hope that this language will avoid much of the present difficulty."

See Addams & Hosford Ohio Probate Practice, 3d Edition, Volume 1, page 917. There is no reported Ohio decision on this subject directly in point with the problem under consideration. **In Re Estate of Burgoon, 80 Oh Ap 465, 36 O. O. 200 (1946),** the Court was deciding whether the right of the surviving spouse to elect to purchase the mansion house enabled him to purchase two other buildings rented for business purposes which were located on the same tract of land but physically and completely separated from the structure used as the home. The Court of Appeals of the Third District held in the negative, and on page 470 the following definition of "mansion house" appears:

"Consequently it clearly appears that the parcel of land on which the mansion house is situated must be used in conjunction with the mansion house as the home of the decedent in order to come within the purview of the subdivision, and the subdivision as a whole constitutes an adoption by the Legislature of the common-law definition of mansion house as including the curtilage only."

"Curtilage" is defined in Bouvier's Law Dictionary, Baldwin's Edition, 1934, at page 261 as follows:

"The enclosed space immediately surrounding a dwellinghouse, contained within the same enclosure. * * *

"It usually includes the yard, garden, or field which is near to and used in connection with the dwelling."

In the case of **Scobey v. Fair, 70 Oh Ap 51, 24 O. O. 371 (1942),** the court was deciding whether the surviving spouse was entitled to the rent from other apartments under the same roof as the mansion house and was construing §10509-79 GC (§2117.24 R. C.). On page 53 the court commented on the "mansion house" as used in the aforesaid Section as follows:

"But what should be the rule under the statute, if the mansion house happens to be the upstairs rooms of a store building, or a single flat in a two, four or ten-suite apartment? If the family occupies one apartment and rents other apartments under the same roof surely it was not intended or contemplated that a surviving spouse might be entitled to the year's rental of all other apartments which were let for profit.

The purpose of the statute was to preserve the home for the surviving spouse for the period of one year; and that which is used, possessed and occupied by the family as a home is the mansion house."

Several definitions of "mansion house" appear in legal and judicial dictionaries. That from Bouvier's Law Dictionary, supra, page 752, has been quoted by Ohio courts with approval and is as follows:

"The term 'mansion-house,' in its common sense, not only includes the dwelling-house, but also all the buildings within the curtilage, as the dairy-house, the cow-house, the stable, etc.; though not under the same roof nor contiguous."

Reference to other definitions from such dictionaries shows that the term "mansion house" is quite often used interchangeably with "dwelling house" and "homestead." Law Dictionary with Pronunciations, 2d Edition, Ballantine; Cyclopedic Law Dictionary, 3d Edition; Black's Law Dictionary, Deluxe Edition; Stroud's Judicial Dictionary, Third Edition. These definitions grew out of interpretations necessary in burglary prosecutions, homestead exemption matters, and, as in the case of Scobey v. Fair, supra, widow's quarantine.

Under the facts as presented in the case of In Re Estate of Burgoon, supra, the premises sought to be purchased were physically separate from those buildings which were not occupied as the mansion house. Under the facts of Scobey v. Fair, supra, the Court was deciding the right to the income from the premises and there was no necessity to consider the inability to separate the mansion house from the rental units. Similarly, those definitions which have evolved from burglary prosecutions and exemptions of homesteads from execution are not concerned with any physical separation of the premises, nor was there any necessity for deciding whether the entire premises were in fact a mansion house where such premises constituted a single nonseparable urban unit which was used as the mansion house as well as for income-producing purposes. It would not seem productive, therefore, to make a more detailed analysis of the definitions of "mansion house" nor of the decisions from which many were taken, for apparently there are no general principles to be drawn therefrom which could render any material assistance to the Court in the case at bar.

Sec. 10509-89 GC (§2113.38 R. C.) grants to a surviving spouse a valuable property right. What was the legislative intent behind such a law? In determining legislative intent it is necessary to ascertain the defect in the preexisting law, the remedies provided by the statute under construction, and the reasons for the remedies. A very ancient but still accurate rule

is stated in Sutherland's Statutory Construction, 3d Edition, Vol. 3, Section 5505, page 41, note one:

"Probably the best approach is found in Heydon's Case, 3 Co. Rep. 7a, 76 Eng. Rep. 637 (Ex. 1584), where it was stated, 'and it was resolved by them, that for the sure and true interpretation of all statutes in general (be they penal or beneficial, restrictive or enlarging of the common law,) four things are to be discerned and considered:—

" '1st. What was the common law before the making of the Act.

" '2nd. What was the mischief and defect for which the common law did not provide.

" '3rd. What remedy the Parliament hath resolved and appointed to cure the disease of the Commonwealth.

" 'And, 4th. The true reason of the remedy.' "

It would appear quite logical that the "mischief or defect" sought to be corrected was the inability of a surviving spouse to retain the home for himself or herself and the other members of the family, as a matter of right. This defect was corrected by the present statute as well as its predecessors. Recognizing the rights of general creditors and other interested persons, the spouse must pay the appraised value of the property in order to complete the purchase. It would also appear that the present §10509-89 GC (§2113.38 R. C.), was enacted by the General Assembly to further extend the long-standing public policy of protecting widows, widowers, and minor children.

In the construction of laws relating to humane policies a liberal construction should be given by the courts. See 37 O. Jur., Statutes, Section 415, page 737:

"Statutes enacted in Ohio for the protection of human life, or statutes of equitable character and beneficent tendency, or statutes granting a valuable right and grounded upon principles of a humane public policy, have been given a liberal construction by the courts."

Sec. 10214 GC (§1.11 R. C.) provides in part that the provisions of the Probate Code along with certain other provisions "shall be liberally construed, in order to promote its object, and assist the parties in obtaining justice." Judge Wanamaker in State, ex rel. Maher v. Baker, 88 Oh St 165, 172 (1913), defined a liberal construction:

"The strict construction, however, must not squeeze out the life blood of the statute, nor should the liberal construction result in the exercise of the legislative power of amendment under the mask of so-called interpretation. In short, it is not the proper province of the court to add to or substract

from the intended meaning and scope of the statute. In any case, the interpretation should be reasonable, consistent with the language used, and conducive to the purposes to be accomplished by the enactment of the statute."

Under the facts herein presented the decedent and his incompetent spouse and their minor children lived in and occupied one side of the house as a home. It is not within the province of judicial statutory construction to deny the right of the spouse to purchase unless the premises were not the mansion house in fact or, once having been the mansion house, have lost that characteristic. The Court does not believe it would be justified in disqualifying a spouse to purchase solely because rent was received from a portion of the premises or for any other reason not specifically set out in the statute. It would appear, however, that the uses to be made of premises other than as a home and the extent of such uses for rental or commercial purposes could reach a point that the character of the home would be so changed that there would no longer be a mansion house.

It is the opinion of the Court that where a husband and wife occupy a non-divisible urban house as a home, the mansion-house character of the premises attaches and is not destroyed either in whole or in part by the fact that the husband and wife use part of the house for rental or other commercial purposes unless the commercial use becomes so pretentious that the occupancy as a home is merely incidental to the commercial use of the premises. In applying this rule to the case at bar, certain facts are clear: the entire premises are a "house," a part of which the decedent and his wife occupied as a "home"; the premises are not physically divisible into commercial and mansion-house units; the amount of revenue received from the rental units is not pretentious; and finally, the commercial usage of the premises was not so extensive as to make the usage as a home only incidental to commercial usage and blot out the mansion-house character of the premises.

The next question for decision is: May a guardian for an incompetent surviving spouse, by a petition duly filed in the probate court, obtain approval and authority for the purchase of the mansion house of a decedent under the provisions of §10509-89 GC (§2113.38 R. C.)?

The Court has been favored with a persuasive brief filed by counsel for plaintiff which makes a distinction between the powers of a guardian in the exercise of economic as contrasted with personal rights of a ward in which he contends that the guardian has the authority, with approval of the Court, to

make decisions for the ward that involve both economic and personal factors wherein morals or religion are not an issue and where the action to be taken is in the best interests of the ward.

An examination of the provisions of the General Code discloses several Sections that set out the powers and duties of guardians. **Sec. 10507-15 (§2111.14 R. C.)** provides:

"In addition to such other duties as are provided by law, every guardian appointed to take care of the estate of a ward shall have the following duties:

"1. Within three months after his appointment to make and file a full inventory, verified by oath, of the real and personal estate of his ward, with its value and the value of the yearly rent of the real estate. Failing so to do for thirty days after he has been notified of the expiration of the time by the probate judge, the judge shall remove him and appoint a successor;

"2. To manage the estate for the best interest of his ward;

"3. To pay all just debts due from such ward out of the estate in his hands, and collect all debts due to the ward; in case of doubtful debts, to compound them, to appear for and defend, or cause to be defended, all suits against his ward;

"4. To settle and adjust, when necessary or desirable, the assets which he may receive, in kind, from an executor or administrator, as may be most advantageous to his ward. Before such settlement and adjustment shall be valid and binding, it must be approved by the probate court, and such approval entered on its journal; with like approval, to hold the assets as received from the executor or administrator, or what may be received in the settlement and adjustment of such assets;

"5. To obey all orders and judgments of the proper courts touching the guardianship;

"6. When for the best interests of the ward, to bring suit in his behalf."

**Sec. 10501-53 GC (§2101.24 R. C.)** provides:

"Except as hereinafter provided, the probate court shall have jurisdiction: * * *

"4. To appoint and remove guardians and testamentary trustees, direct and control their conduct, and settle their accounts; * * *

"The probate court shall have plenary power at law and in equity fully to dispose of any matter properly before the court, unless the power is expressly otherwise limited or denied by statute."

The balance of the provisions of the Probate Code sets out

other specific duties, none of which is dispositive of the questions here raised. These Sections above quoted, of necessity, are broad and general in their scope and do not specifically either include or exclude the right of an incompetent widow to make an election to purchase the mansion house at the appraised value; nor have any cases decided by courts of this State been discovered which resolve the issues herein raised. This matter is apparently one of first impression in this State. Mention should be made of the recent case of **Zuber, Gdn. v. Zuber, 93 Oh Ap 195, 50 O. O.** 496 (1952), wherein the Court of Appeals of Cuyahoga County defined the duties and powers of a guardian as follows:

"2. Such guardian so appointed is not the 'alter ego' of the incompetent with power to carry on all the ward's personal or business ventures in the name of the ward and in the same manner as such ward would be able to do except for the adjudication of incompetence.

"3. The office of guardian is to manage and conserve the ward's estate and to provide for the care and protection of his person."

Further clarification of the rights and duties of guardians has been gained by a re-examination of the origin of guardians at common law and the delineation of the powers and duties of such fiduciaries and the powers and duties of the courts having jurisdiction over them. While not all authorities or text writers agree as to the source of a guardian's powers, it is now generally accepted that the common-law rights of guardians stem from the king as parens patriae and as the general protector of all infants, idiots, and lunatics. Woerner's Guardianship, Pages 2 and 3. This authority was in turn delegated by the king to the chancellor under his sign manual as keeper of the king's conscience, and pursuant thereto the superintendence of the trust became and "descended to the American courts of chancery as an inherent and traditional power, always ready to be exercised when the powers of the probate courts are inadequate" 25 Am. Juris., Judicial Appointment of Guardians, Section 23, page 21.

The persons so appointed by courts of chancery were the mere "bailiffs or servants of the court." Woerner's Guardianship, page 450. They had no title to the property of the lunatic, nor were they the representatives of the lunatic so as to sue or be sued as such. This concept of the guardian as the arm or instrument of the king or court does much to clarify the principles upon which the common-law decisions in this field were based. While under more recent enactments and decisions this doctrine has been substantially modified and guard-

ians as such are clothed with certain statutory powers to be exercised under the supervision of the court, the guardian originally occupied, and in many respects still occupies, a position as agent of the court as contrasted with one who can exercise his own unlimited discretion. As has been pointed out, the office carries no delegation of authority so as to enable the guardian to act as the "alter ego" of the ward. Zuber, Gdn. v. Zuber, supra.

There is little doubt that the common-law aspects of the law in guardianships are still of importance today. See 89 Am. St. Reports 261:

"a. Present Importance of Subject.—The relation of guardian and ward has, both in England and in America, been made the subject of a very considerable amount of legislation. The general nature of the relation and of the powers and duties of the parties thereto, nevertheless, remains to a great extent the same as at common law. Much of the legislation referred to is merely declaratory of the law as it previously existed, and even where the effect of the statute law is to change the common law of the subject, the latter has by no means lost its importance. For while, in so far as the statute governs any particular portion of the subject, it excludes the general law * * * as to other matters it is well settled the common law still controls: * * * The practical importance, therefore, at the present day, of determining the powers with which a guardian was clothed by the common law, is both obvious and real."

It should be emphasized that there was and is a distinction throughout our jurisprudence between the powers of guardians and the powers of the courts exercising chancery jurisdiction over such guardians.

This legal principle was recognized in the leading case of Van Steenwyck v. Washburn, 59 Wisc. 483, 17 N. W. 289, 48 Am. Reports 532 (1884), in an action for a will construction. The bill filed by the executors raised the question of whether the insane widow was to take under or against the will. The court held that the election could not be made by the widow since she was not competent, that it could not be made by her guardian, but that the court could and would make such election for her. In so holding the court used the following language at page 502 et seq.:

"The next inquiry is, How and by whom is the election to be made? The counsel for the executors say the right and duty of making an election are personal to the widow, and must be made by her alone." * * *

"We are not aware of any direct authority which decides that

the guardian of an insane widow may elect for her, in the absence of a statute giving him that right.

"It therefore follows, from these views, that the election made by the guardian of Mrs. Washburn was without authority of law, and can have no validity whatever."

"Independently of the statute, probably no one would question the power of a court of equity, where the application was in time, to elect for an insane widow, or other person incapable from want of capacity of personally making it. Such a power has often been exercised by courts of chancery in England and in this country, and the jurisdiction is well established. Does, then, the statute which requires the widow to elect, limit or abrogate this jurisdiction, so that a court can no longer exert it on behalf of an insane widow? We perceive no sufficient grounds for saying that it does."

On March 25, 1931 the Supreme Court of Ohio passed upon a similar question in the case of **Ambrose v. Rugg, Admx., 123 Oh St 433,** 175 N. E. 691, 74 A. L. R. 449 (1931). In the decision by Judge Matthias the Van Steenwyck v. Washburn case, supra, was examined and cited with approval. The case arose in the common pleas court and raised the question of whether or not an election to take under or against the will could be made for an incompetent widow where the election had not been filed within time. It was contended on behalf of the widow that the common pleas court, sitting as a court of equity, had the jurisdiction, power, and duty to make this election in the best interests of the widow. At page 436 Judge Matthias stated as follows:

"An election by her was impossible. In that event, should not a court of equity determine whether the provision made for her by law was more valuable and better than the provision made by will, and, if it so find, direct that election be entered in her behalf to receive the benefit of the provision which is more favorable to her interest? The mere statement of the proposition suggests that the rights and interests of a mentally incompetent person should be safeguarded, and that opportunity should be accorded to secure for her or her estate the same legal benefits and advantages as would accrue to a widow of sound mind. What is hers under the law should not be lost by reason of her mental condition. Surely the hand of equity may intervene for her protection.

"The doctrine of election of rights grew up independently of statute, * * *"

The Court held that, in the absence of some clear and convincing act evidencing an election by the widow, an election could be made for her. While this decision may have been

affected by subsequent changes in the statutes being considered, the doctrine as set out would appear to be as valid now as then. Since the right of the widow to purchase the mansion house at the appraised value is analogous to the right of a widow's election to take or not to take under the will of her deceased spouse, the foregoing cases are persuasive.

The decision in Ambrose v. Rugg, supra, was rendered prior to the enactment of §§10501-53 and 10501-55 GC, now §2101.24 R. C., which gave to the probate courts "plenary power at law and in equity fully to dispose of any matter properly before the court, * * *" Therefore, the principles which originally guided courts of chancery in the exercise of their equitable jurisdiction over guardians and wards are now equally applicable to probate courts of this State.

Largely based on the foregoing case, the following note appears in 74 A. L. R. 453:

"Upon the theory that the right of election is a personal right, there is no dissent from the proposition that, in the absence of express statutory authority, the guardian or commission of an incompetent cannot make an election, but such election must be made by or under the direction of a court having chancery jurisdiction over the person or estate of the incompetent."

After an examination of the foregoing cases and text writers hereinbefore cited, it must be concluded that this Court, sitting as a court of equity, has the inherent power, independent of statute, to intervene and permit the guardian to exercise for this incompetent a right which would be otherwise lost to her because of her mental condition, there being no statute which gives the incompetent surviving spouse an adequate remedy at law.

Sec. 10507-15 GC (§2111.14 R. C.) provides that the guardian has a duty "To manage the estate for the best interest of his ward." The Court is of the opinion that the action here contemplated is clearly in the best interests of this ward and necessary to conserve her estate which consists of an undivided one-half (½) interest and a vested interest in the other undivided one-half (½) received as a result of the death of her husband. The statutes of Ohio, if not an extension of the powers and duties of guardians as they existed prior to the enactment thereof, are certainly a recognition of the common-law duties of guardians of incompetents.

The Court is therefore of the opinion and holds that it would be in the best interests of the incompetent to permit and direct the guardian to make the election to purchase the mansion house at the appraised value. The Court is further

of the opinion that the election can be made at this time under the pleadings as filed in this cause.

Counsel may prepare an appropriate entry.

Costs to the estate of Carl B. Meeks, deceased.